By the Court, Welles, J.
This cause has been argued with all the learning and ability demanded by the amount in controversy, and the importance of the principles involved *642 Many topics have been discussed in the arguments, as illustrative of the principal grounds of controversy, upon which, however, in the view I have taken of the merits of the cause, it is not necessary to express an opinion. I shall, therefore, confine myself to the exposition of those questions and principles, which, in my judgment, dispose of the whole litigation, as far as they appear proper for the final adjudication of the present suit;
The question whether the trust powers conferred upon the Farmers’ Loan and Trust Company by the act of April 17th, 1822, (Sess. Laws of 1822, ch. 240,) survive the fifteen years’ limitation of the act by which that company was chartered, (Sess. Laws of 1822, ch. 50,) was elaborately discussed upon the argument, and has received a careful examination; but upon submitting my views upon that subject to my brethren, there does not appear to be a unanimity of opinion; and as the cause may be decided without reference to that question, the consideration of it here, is waived.
I. Assuming that such trust powers do continue, were the transactions in this case within the scope and purview of those or any other powers of the company, and what was the real and true nature of the transactions ?
The parties; when they entered into them, were careful to denominate them trusts. If they have called them by right names they certainly are most unusual trusts, and it was well remarked on the argument, by the plaintiff’s counsel, that the instruments creating them were anomalous in their form, although he contended that was no objection to them; that they resembled trusts more than mortgages, and that effect should be given to them accordingly as they most assimilated to the One or th.e other.
The doctrine of uses and trusts was early introduced into the jurisprudence of England, probably as early as in the reign of Edward 3.- It was adopted by the ecclesiastics of that age to evade the statutes of Mortmain, and was borrowed from the fidei commissum of the civil law. (1 Cruise's Dig. 354 to 359. Story's Eq. Jur. §§ 965,6.) The intention of the statute (27 Hen. *643 8 ch. 10,) was to destroy that double property in land which had been introduced by the invention of uses. But that intention was, to a great extent, defeated by the strict construction given to the statute by the subtlety of the early English chancellors, by holding that there were some uses to which the statute did not transfer the possession, but which still continued separate and distinct from the legal estate, and were taken notice of and supported by the court of chancery, under the name of trusts. (1 Cruise’s Dig. 411.) A trust therefore is now said to be a use not executed by the statute. (Id.) The same author describes a trust estate “to be a right in equity to take the rents and profits of lands, whereof the legal estate is vested in some other person j to compel the person thus seised of the legal estate, who is called the trustee, to execute such conveyances of the land as the person entitled to the profits, who is called the cestui que trust, shall direct, and to defend the title to the land. In the mean time, the cestui que trust, when in possession, is considered, in a court of law, as tenant at will to the trustee.” Another author has the following: “A trust cannot be more exactly defined than in the terms employed by Lord Coke for the definition of a use, to wit: A confidence reposed in some other, not issuing out of the land, but as a thing collateral, annexed in privity to the estate of the land, and to the person touching the land, for which cestui que use has no remedy but by subpoena in chancery’’ (Lewin on Trusts, 15.) The author then analyzes the definition by a division of it into six parts, and giving to each a particular consideration and explanation. Upon the 3d he remarks, “It is a confidence reposed in some other; not in some other than the author of the trust, for a person may convert himself into a trustee, but in some other than the cestui que trust, for as a man cannot sue a subpoena against himself, he cannot be said to hold in trust for himself. If the legal and equitable interests happen to meet in the same person, the equitable is forever absorbed in the legal ; as if A. die seised of the legal estate ex parte paterna, and of , the equitable ex parte materna, the maternal line has no equity against the heir of the paternal.” (See also Goodright v. *644 Wells, Doug. 777.) Three things are said to be indispensable to constitute a valid trust; first, sufficient words to raise it; secondly, a definite subject; and thirdly, a certain or ascertained object. (Story’s Eq. § 964. Crunys v. Coleman, 9 Ves. 323.)
By the revised statutes of this state, all passive trusts are abolished, and the whole beneficial interest or equitable right jto the possession and the reception of the rents and profits of the land, is vested in the cestui que trust. Express or active trusts are allowed for the following purposes: 1st, To sell land for the benefit of creditors; 2d. To sell, mortgage or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon; 3d. To receive the rents and profits of lands, and apply them to the education and support of any person during life, or any shorter period: subject to certain limitations and restrictions contained in §§ 37, 38, 39, (1 R. S. 727,) of the previous article; 4th. To receive the rents and profits of real estate, and to accumulate the same for the same purposes and within the same limitations and restrictions. (1 R. S. p. 727, §45; p. 728, § 55.) By section 2 of the act of April, 1822, before referred to, the trust powers of this company are restricted to such trusts, “ as are usual with other trustees,” and they are only authorized to receive and execute such trust, as are declared in the deed or devise by which the property is conveyed to them in trust.
In the first article of the agreement between the company and Carroll, the former covenant that they will, in consideration of the conveyances which are declared to be in trust, “ and with a view to enable the said Charles H. Carroll, to pay off and satisfy all the charges,.liens and incumbrances upon the said real estate,” immediately execute and deliver to Carroll the certificates, «fee. In the second article, it is declared to be understood that Carroll shall apply the certificates, or their proceeds, to the payment of the liens and incumbrances. So far, I can perceive nothing that savors of a trust. „ It is nothing more than an agreement, by the company, to loan the certificates, and by Carroll, to make a certain application of them, or a portion of them. The company have no active duty to perform. Carroll *645 is to pay the incumbrances by means of the certificates thus obtained. The next article authorizes the company to make sales and .conveyances of the land to purchasers, “ whenever duly authorized and requested” by Carroll. It give the company no authority to sell, excepting as so authorized and requested. They are not to give covenants to purchasers, but Carroll is bound to do so when required. The company are to receive the consideration money, and to decide whether it is sufficient in amount in reference to the land to be conveyed. They are, in fact, to do nothing but execute conveyances when Carroll shall direct. They may, and I see not but they must, remain entirely passive, except as Carroll permits them to act. No discretion is reserved to them, except what shall be necessary to prevent their security being impaired; a provision which would be quite necessary and proper, viewing the transaction in the light of a loan secured by these conveyances. The fourth article seems to be similar in its object and effect to the last. No duty whatever is imposed upon the company. Carroll’s active duties are enlarged and specified, with a provision that they shall be so exercised as not to impair or diminish the security of the company, and saving their right to receive all moneys, &c. The fifth article makes it the duty of the company to collect moneys, &c. “ upon the request of the said Charles H. Carroll, and to make sale or sales of the whole or any part of the real estate conveyed, at any time after ten years from the date of the agreement, “ and at any time sooner, should it become necessary for the safety and indemnity” of the company. Here, then, are provisions for the benefit and security of the company only. They are to collect and receive moneys upon request of Carroll, and they may collect without his consent, and also may sell the whole or any part of the trust estate, after the lapse of ten years, and sooner, if necessary for their safety or indemnity. All this looks, to my mind, much more like providing for the repayment of a loan than the provisions of an active trust, or the specification of the duty of a trustee. It will be seen that this article leaves the company no discretion or power to act, until set in motion *646 by Carroll, except in case it becomes necessary for their safety and indemnity; -when in effect, a proceeding in the nature of a foreclosure, not for the benefit of any cestui qua trust, b.ut for-their own benefit exclusively, is authorized. And with respect to the duty of collections mentioned in the first part of the article, it is not to be undertaken unless requested by Carroll and provision is made in other places for the appointment of an agent to make the collections and for the performance of other duties, all at the expense of Carroll. The sixth article provides for the appointment, by the company, of an agent, to be approved of by Carroll, resident in Livingston county, with full powers to collect and receive, on behalf of the company, all moneys, &c. to deliver- deeds, &c. upon receiving the purchase money, &c. all to be paid over by the agent to the company, &c. This is no more than another of the means, in detail, adopted by the parties, with a view to the reimbursement of the company for the amount of the certificates. No mention or allusion is made to any cestui que trust. The seventh article, requires, all bonds and other securities, and papers to be to and with the company, “ who. are to receive all moneys,” &c. pointing, as in the last, solely to the reimbursement of the company. The eighth declares that the compensation of the agent, to be appointed under the sixth article, shall be fixed by the company, which, with all other expenses of the trust, is to be borne by Carroll. This provision, it seems to me, only has the effect to protect the company against any diminution of their expected profits to arise out of the transaction, and does not, in the remotest sense, fortify the idea of a trust. The ninth does, nothing more than the law would probably have done without it, viz. requiring the company to recognize and fulfil outstanding leases—a provision as. proper in view of a loan secured by these conveyances, as of a trust. The tenth article declares that Carroll shall pay and allow seven per- cent, per annum to. the company, on the amount of the certificates, to commence at the time of their delivery, which, by the first article, were to bear interest at five per cent per annum, the difference between the interest which the company were to pay, and that which, *647 they were to receive, being two per cent, is declared to be “ only a compensation, allowance or commission” to the company, for undertaking and executing the trust, &c.; and the same article provides for selling, &c. in case interest remains due the company over thirty days. While the parties here talk about a trust, not one of the characteristics of a trust appears. The eleventh contains a provision for the redemption of the certificates, and a pledge of the capital of the company to that object. The twelfth, is an agreement by the company to receive good bonds and mortgages, well secured, <fcc. upon portions of the premises conveyed, worth double the amount “ to be loaned on the same;” such bonds to be payable within ten years from the date of the agreement. The last two articles certainly have nothing in them to characterize the transaction as a trust. The 11th is designed to give credit to the certificates, and render the holders secure, and the 12th looks to the repayment of their amount to the company, and provides ho\v it may be made. The thirteenth, and last of the articles of agreement, is any thing but a declaration of trust. It is merely a covenant on the part of the company to reconvey, upon payment being made in any of the ways before provided, and a covenant on the part of Carroll to pay any deficiency that may be found due the company, should the real estate, and securities to be taken on sales thereof, prove insufficient to reimburse them the amount of the certificates to be delivered to Carroll, and to indemnify the company against all loss or damage, &c.
I have thus gone through with an examination of all the provisions and articles of one of the agreements by which it is contended that a trust is manifested, with the view of discovering, if there were to be found the usual attributes and properties of a trust. Supposing Carroll to be the creator of the trust, and this company the truste'e, who is the cestui que trust 7 I confess that I have been unable to find any. If it is said that they are the persons holding the incumbrances mentioned in the recitals to the agreement, the answer is that the trustee has no duty to perform to them, of any description whatever. The company are not bound to pay them, and no privity exists between *648 them. Suppose the incumbrances should never be discharged by the company or Carroll, could a bill be sustained by the creditors against the company, to compel the satisfaction of the incumbrances, or to enforce the execution of the trust in their favor ? I think not; for the reason that the company have not agreed to pay these incumbrances. It would be most unjust and inequitable to compel them to do so, because they have furnished Carroll with the means to do it; and it would, in effect, be requiring them to pay twice for the same thing, and that to persons with whom and themselves there appears to be no relation or privity. I think, also, there may be some objection, on the ground that there is no certain or ascertained object; by which I mean that the papers and instruments by which it is contended the trust is manifested, do not indicate, with sufficient clearness, who are the beneficiaries of the trust.
The agreement recites 1st. That Carroll is the owner of certain real estate, situate, &c.; 2d. That there are several charges, incumbrances or liens outstanding and existing upon it; 3d. That Carroll, being desirous of having the real estate converted into cash and available securities, by the sale of the same in suitable parcels and at convenient times, the company had agreed to accept a conveyance of the real estate, and assume, perform and execute for Carroll, the trust thereby declared, &c. and that Carroll had, in pursuance of the agreement, executed and delivered to the company, on the same day, a conveyance in fee of the said real estate. The agreement then witnessed that the conveyance was made by Carroll and accepted by the company, upon the special trusts and agreements thereinafter declared, &c.- Then follows the thirteen articles before mentioned.
In looking through this whole agreement, and regarding it in the light of a trust, I am at a loss to see the object. What was the company to do but, in substance; to advance their credit to Carroll, and receive back the amount advanced, with interest? Every provision of the agreement may be referred to and brought within these two obj ects. They could not even sell any of the hind without the concurrence of Carroll, unless in *649 default of the payment of interest or principal; and in either event, it was a means of reimbursement of their advance to Carroll, and for no other object.
Again ; Carroll was at liberty to put an end to their powers any day, by refunding, &c. upon which they were bound to re-convey the land to him. All these things are substantially the usual incidents of a loan secured by mortgage.
In the consideration of the question, it is proper to inquire not only whether the transaction can be upheld as a trust in any sense, but whether it is such a trust as the company by their chartered powers were authorized to undertake ; and also whether it is such a one as is authorized by the revised statutes,,
By reference to the 2d section of the act of April, 1822, before referred to, it will be perceived that the trusts which the company are authorized to take, are such, and such only, as are declared in the deed or devise, by which the property to be held in trust is conveyed to them. It was said, on the argument, in answer to the objection that the alleged trust was not declared in the deed by xvhich the land xvas conveyed, that the deed, declaration of trust, and the certificates were all one transaction, and should be considered the same as if they were all embodied in one and the same instrument. They may, perhaps, be regarded as one transaction; but does it folloxv that they should therefore be treated as one instrument 1 In viexv of the objection under the statute, I think it does not. All the evils xvhich the statute xvas designed to guard against, are liable to exist as much in this case as in any other. It is not, in this viexv, a question of construction of the instruments, or xvhelher each is to be interpreted xvith reference to the others, hut a question of power. Where a corporation relies upon a grant of power from the legislature, for authority to do an act, it is as much restricted to the mode prescribed by the statute for its exercise, as to the thing alloxved to be done. In this case the legislature say to the company, you may take conveyances in trust, and execute such trusts as are declared in the conveyances. It does not say you may take and execute trusts generally. I incline strongly to think the trust power of the *650 company was limited by the statute to such trusts as should be declared in the deed or devise, and as no trust is declared in the conveyance in this case, that the power has not been well executed.
If this transaction is a trust, is it such a one as is usual with other trustees. It was contended upon the argument on behalf of the plaintiffs, that the statute in this respect only intended to confine the company to legal trusts. If that be so, I can see no utility in the provision ; for it could not have been necessary, in order to prevent illegal trusts, to insert an express provision prohibiting them. It may be difficult to give an instance of a trust otherwise legal, which this company might not take, unless the present case affords an illustration; provided it be a trust in any sense. I have supposed that where a usual valid trust is created, all parties but the trustee retire from any active participation in it, and that the beneficiaries designated could always go to a court of equity for the enforcement of their rights against the trustee. Here the trustee had nothing to do after the papers were executed, but to take care of itself; and no remedy, legal or equitable, is left to the cestui que trust, as I have before attempted to show, against the trustee.
The late Vice Chancellor Whittlesey, in an opinion upon denying a motion to dissolve the injunction mentioned in this cause, says, upon the point now under discussion, “ The legitimate office of a trustee is to manage the estate or fund committed to him, with care and fidelity, invest its avails for the benefit of the persons interested, or, in other words, to receive and manage the property of others for the benefit of other parties» It is no part of the legitimate office of a trustee to give his own obligations, predicated upon the trust estate, or to assume any other liability than care and fidelity» Least of all is it legitimately or properly his office to give his own obligations simultaneously with the creation of the trust, and assume a trust created for the very purpose, and no other, of meeting the obligations executed by himself. The latter would be a mere security or indemnity for his own liabilities, and possesses, so far as I can perceive, no one feature of a trust.” It seems to *651 me that there is much force and reason in these remarks, and they accord so well with my own views that I have thought proper to introduce them in this connection.
Again; was this transaction a trust authorized by the revised statutes? It was not claimed, upon the argument, to come within either of the subdivisions of the section authorizing express trusts, (1 R. S. 728, § 55,) excepting the first and second. Those are, 1st, to sell lands for the benefit of creditors ; 2d, to sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon. It was insisted that the case did come within both of these subdivisions.
First, to sell lands for the benefit of creditors. Is this trust, as manifested by the agreement, created for that purpose ? The argument is that it is for the benefit of the incumbrancers who are creditors, by putting in the hands of Carroll the means of paying and discharging them. But the question returns, how are they to be benefited ? Where is the security that Carroll would be able to convert the certificates into money, or that the creditors would receive them in payment j or that Carroll would not misapply these means or convert them to purposes of speculation ? The creditors have no power over the company, in any event, nor over Carroll beyond what they possessed before the transaction was entered into. It is not perceived hoxv the creditors could be benefited in any legal sense by the creation of such a trust.
Second. To sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon. The inquiries and remarks made in reference to the first subdivision apply xvith the same force to this. The argument to bring the case within either of these provisions seems to me to be far fetched, and that after an examination of the agreement, it is impossible not to see that the object was one entirely different from any thing contemplated by the section of the statute in question, as I shall hereafter attempt to show.
II. It is claimed on the part of the plaintiffs, that if these instruments do not create valid trusts per se, they do create powers in trust, which may be lawfully executed by the com *652 pany, with the aid of the court of chancery, for the purposes specified in the agreement. Many of the arguments to show that here was not a trust, go equally to prove that there was no power in trust. The revised statutes have attempted to restrict and simplify the doctrine of powers, and powers in trust; whether the attempt has been successful, is doubted by many. The doctrine was among the most intricate and difficult in the law, on account of its artificial character, and the refinements and subtleties of logic to which it was frequently carried. The statute, however, still recognizes the doctrine, under the modifications which it has undertaken to create.
A power in trust is to be understood in contradistinction to an estate in trust. The former is a mere authority or right to limit a use, while the latter is an estate or interest in the subject, A trustee is always invested with the legal estate; but this is not necessary with respect to the donee of the power. In the case of a power in trust, there is always a person other than the donee or grantee of the power, which person is called the appointee, answering to the cestui que trust in a simple trust. The revised statutes define powers in trust as follows: “ A general poxver is in trust when any person or class of persons, other than the grantee of such power, is designated as entitled to the proceeds or any portion of the proceeds or other benefits to result from the alienation of the lands according to the power. A special power is in trust, first; when the disposition which it authorizes is limited to be made to any person or class of persons, other than the grantee of such power. Second; when any person or class of persons, other than the grantee, is designated as entitled to any benefit from the disposition or charge authorized by the power.” (1 R. S. 734, §§ 94, 95.) These provisions show that in all cases of a power in trust, an appointee or beneficiary other than the grantee of the power, is contemplated. It is as necessary an ingredient in the case of a power in trust, as a cestui que trust is in the case of a conveyance or devise in trust. In the present case, the question naturally arises, who or where is the appointee or person or class of persons beneficially interested in the execution of the *653 power, other than the grantee of the power 1 No third person has any interest whatever in the performance of the stipulations and provisions of the agreements. A power in trust involves the idea of a trust, as much as a trust estate. In both cases a confidence is implied. The difference is in the mode of effectuating the object. In one case it is done through a conveyance or devise of an estate in trust, by which the grantee or devisee becomes seised of the legal estate in the land; in the other, by the creation or grant of a power by which the donee is invested with an authority in relation to the future use or disposition of the land.
Having shown, under a former head, that here was no trust, in the proper sense of the term, and believing that there can be no power in trust, independent of the idea of a trust; in other words, that there can be no power in trust without an appointee or beneficiary other than the donee of the power, I deem it unnecessary to spend more time to prove that here can be no power in trust; excepting to add that it appears to me that there is no power given in this case to the company, of a different nature from that which is in substance contained in many mere mortgages. Here is a power to sell the land in case of default of payment, and that is all the company are authorized to do, without the approbation of Carroll; and all they are empowered to do with his consent has for its object the same thing in substance—the repayment to them of the amount advanced. In both cases it is solely for their benefit, and the interest of any supposable appointee or beneficiary entirely lost sight of and disregarded.
I1L The plaintiffs also contend that if the instruments between the parties should be held invalid as trusts and as powers in trust, they are still sustainable as covenants, on the part of the defendant Charles H. Carroll, to convey the lands when the company should dispose of them, or have a right to dispose of them, in order to satisfy the charge for which the agreements were entered into, and which yet remain unpaid.
The examination and discussion which I have given this case so far, has been more to meet the affirmative propositions *654 advanced by the plaintiffs’ counsel, and to show what the nature and legal effect of the transaction was not, than what it was; and perhaps unnecessary time and labor has been devoted. to that object; for if the view I entertain as to what its true character was, in substance and effect, be correct, it refutes and overturns each of those propositions. The one last stated will be met by endeavoring to show what, upon my first acquaintance with the case upon the argument, was strongly impressed upon my mind, and which has been fully confirmed by subsequent examination and reflection ; and that is, not only that the legal effect of the execution and delivery of these instruments was to constitute a loan by the Farmers’ Loan and Trust Company to Charles H. Carroll, and to secure the repayment thereof by tire latter to the former—but that such was the understanding and intention of the parties at the time; although it was to be disguised by terms and language employed in the papers, as a trust.
It seems to me that no person can attentively examine all these papers together—the conveyances, the agreements, and the certificates with the coupons annexed—without being forcibly impressed with the idea of a loan. Notwithstanding the name by which the parties have chosen to call it, the essence of' it all is to place Carroll in funds, no matter for what object, which funds the company are forthwith to furnish in the shape of these certificates; and to secure a return of the amount by Carroll, he conveys the lands and real estate to them. It was money, or something that he could convert into or use as money, that Carroll wanted. It was something with which hq should be able, among other things, to. pay debts. The first and second articles of the agreements show this to have been the case. The second seems to contemplate, in the first place, that he shall use the certificates as money, if practicable; and secondly, if not practicable, to dispose of them for money; and the certificates were as really obligations on the part of the company to pay money, as the notes of a bank could be. They were to be, and were in fact, something to answer the place of money. For that purpose Carroll wanted them, and for no *655 other; and that such was the mutual understanding of the parties is further evident from the fact that after the execution of the papers, and before the company would allow them to be unconditionally delivered to Carroll, they were put into the hands of an agent of the company, who was dispatched with Carroll to Baltimore with a view to the latter using them in the liquidation of the incumbrances held by Tiernan and Mrs. Brinton. After Carroll had subsequently placed the certificates in the hands of the agent of the Rothschilds to be remitted to Europe and sold, and had received an advance from the latter on account of them, he deposited with the company the whole amount of funds so obtained, and stipulated with the company to allow them to retain, in deposit, $26,000, for the payment of what might be due on the Tiernan mortgage ; the balance, together with such further sums as should be deposited with the company on his account by Rothschilds’ agent, were to be held by the company subject to Carroll’s drafts upon them. It seems to me that in any and every aspect in which the matter can be viewed, it is seen to be nothing but a financial operation for the sole purpose of obtaining money by Carroll upon the security of the real estate in question.
The various proceedings between the parties, and the communications passing between them, previous to the consummation of the transaction by the execution and delivery of these instruments, go quite as far to prove it to be a loan as a trust, and I think much farther \ for although the parties have sometimes remembered to call it a trust, yet the idea of an advance by the company to Carroll is a prominent and leading idea throughout. Strike out that, and it is impossible to perceive a rational motive on the part of Carroll to induce him to engage in the transaction. In some of the preliminary papers, the word “ loan” is used, and in others “ trust " I do not attach much importance to these circumstances. The thing is to be judged of as a whole after its completion ; and if the parties have employed a false nomenclature in reference to the subject, that cannot determine its character or effect, but tends rather to cast suspicion upon it. Although the conveyances by Car *656 roll to the company are absolute in terms, and assume to convey the entire fee, yet the agreements executed by the parties, at the same time, show that they were intended only as security in the nature of mortgages for the repayment of the loan of the certificates ; and they are therefore to be considered as mortgages. (1 R. S. 756, § 3.)
IV. Having come to the conclusion that here was neither a valid trust nor a power in trust, but that the transaction was a loan secured by instruments in the nature of mortgages, it becomes necessary to inquire whether it can be enforced as such. To this it seems to me there are two objections, 1, The company did not possess the power of making loans. Their act of incorporation gave them such power in express terms, but the act was to expire in fifteen years, except as to insurances on lives and the granting of annuities; and admitting that the-trust powers conferred by the amendatory act of the same session in which the company was chartered, would survive the fifteen years, there is nothing in any of the acts to countenance the idea that the company’s loan powers would survive that period. It may be that they might invest their surplus funds if necessary, and take security for the re-payment; if so, it would be only an incidental power to those of insurance upon lives, granting annuities, and receiving and executing trusts, and perhaps would be implied in order fairly to carry out those express powers which are retained under the acts. It cannot be contended that the company can carry on the business of loaning moneys by virtue of any power specifically granted by any statutory provision in force at the date of these papers; much less that they could loan their credit in the way and manner here attempted.
The 7th section of the original act of incorporation expressly prohibits the company giving any obligation for the payment of money, except to enable them to fulfil any actual engagement they may make or enter into for loans, &c. or to enable the corporation punctually to pay any losses they might sustain, &c. It seems to me to be idle to spend time to show that the giving of these certificates did not come within the excep *657 lion to this prohibition. The certificates were the thing loaned, and when delivered, the engagement for the loan was completed on the part of the company; and it is impossible to perceive how they can be regarded as enabling or as designed to enable the company to fulfil an engagement for a loan. 2. This loan, and all the securities relating to it, were illegal and void, as being in violation of the usury laws. The transaction "was usurious upon its face, in making a difference of two per cent, between the interest to be paid by the company upon the certificates, and that to be paid by Carroll. In other words, that it was per se usurious. The nominal value of the certificates, at the time they Ivere issued and delivered to Carroll, was not equal to the amount which Carroll was to pay for them, by just the difference in the interest between the two. To illustrate. Suppose A; agrees to lend B. $1000, and it is a part of the agreement that B. shall receive the loan in negotiable promissory notes of third persons, due at a future day, bearing legal interest from the time of making the loan, and that B. shall repay the amount by the time the notes become due, with interest at the rate of nine per cent from the time of the loan. It seems to me that no one would deny that such a transaction would be usurious. If it would not, then why might not the borrower, in the case supposed, legally bind himself to repay the amount borrowed, with interest at the rate of 10, 15', 20, or any other rate per cent? And if 9 per cent would be illegal, 7 per cent would be equally so, if the notes borrowed bore an interest of only 5 per cent.- The difference would be the same in both cases. And upon the same principle, if the notes constituting the loan were payable at a future day without interest, an agreement for repayment, with any rate of interest whatever, must be usurious. It results from the fact that the present prima facie value of the securities loaned are affected by the question whether they are upon interest or not, or by the rate at which they draw interest. If the $1000 of notes are payable in one year without interest, they are worth $1000 less the discount; that is to say, they would be worth at the time of the loan $934,58; and the borrower would agree to pay *658 therefore (on the supposition that the $1000 was to be refunded with 7 per cent interest,) what was worth at the time, $1000; or a bonus of $65,42 beyond the legal rate of interest.
The trust certificates in the case at bar, were each worth, on the same principle, at the time they were issued, $714,28 each, which is the par value, less the discount at two per cent, for twenty years; and by the operation of the instruments between the parties Carroll was in effect to pay to the company a bonus of $285.72 on each $1000 of the loan; making a total of $27,143,40 in the two transactions, beyond the legal rate of interest.
I hold it to be law that in all cases of a loan where it appears upon the face of the transaction, that the lender is in any manner to receive more than the legal rate of interest as a compensation for forbearance upon the thing loaned, whatever the thing may be, it is usury per se. JR.es ipsa loquiter. The distinction is between a loan and a sale or guaranty. In the latter case a man may lawfully contract to receive a compensation beyond the legal rate of interest, provided it is not a cover for usury. Whether it be so or not is generally a question of fact, depending upon the intent of the parties. He has a right to put his credit or responsibility in market, and receive what he can fairly get for it, provided always it is not a device to cover up and hide from view a usurious intent. We have a long train of decisions, both in England and this country, recognizing and establishing that distinction, which are principally collected and referred to in the case of Ketchum v. Barber et al. (4 Hill, 224 to 255, and S. C. in error, 7 Id. 444 to 463.) Such, also, was the principle of the decision in the late case of More v. Howland, (4 Denio, 264.) It is also held or plainly implied in most of those authorities, that if the transaction assumes the character of a loan, it is within the usury statutes, provided more than the legal rate of interest is contracted for.
But I am prepared to hold the transaction usurious upon the evidence. These certificates, as before remarked, were treated by the parties as money. They were loaned to Carroll as such, and the repayment by him at their nominal amount, with interest *659 at 7 per cent per annum was provided for. I think the weight of evidence is decidedly that at the time the loan was made, the certificates were not worth in market their par value. A number of witnesses were examined on this point, and most of them testify in substance that at the time this loan was effected they were at a discount of at least twelve and a half per cent, and not a witness, as I believe, shows them to have been of their par value at any time during the spring of 1838, when the negotiations were consummated. That the depreciation might have been owing in part or in whole to the pressure of the money market at the times to which the witnesses refer, does not in my judgment alter the case. Carroll bound himself to return their nominal amount in money, with lawful interest. It turned out that they were sold by Carroll, in order to raise money, at a ruinous sacrifice.
V. It is claimed by the plaintiff, that whatever may be the character or legal effect of these transactions, the mortgages to Tiernan and Mrs. Brinton legally and equitably belong to the Trust Company, they having been paid with funds furnished by the company, and the one to Tiernan having been assigned to the company by the consent of Carroll, and that the company are entitled, in equity, to be subrogated to them, and to have a decree in this suit for their foreclosure. To this claim I cannot assent, for several reasons. 1st. The agreements were absolute, that Carroll should receive the certificates; and he had the legal right to do with them as he pleased. The money he raised upon them was his to all intents and purposes, at least as against the company, who retained no lien upon the certificates or the proceeds of their sales, in law or equity, for any purpose whatever. If he violated his agreement to extinguish the incumbrances, it could only be the foundation of a personal claim upon him. 2d. These mortgages were in fact extinguished and paid off by Carroll, or with his money, and could not be kept on foot as debts secured by mortgages. If they were paid for by the company at all, it was as Carroll’s agents, and by money raised by him by the sale of these certificates, and if they are valid in the hands of the holders, *660 Carroll may be liable upon his endorsement of them as guarantor. 3d. They could not be held by the company to protect their title, for that title has been shown to be vicious for its illegality; and the mortgages being in their hands, can only be regarded ancillary to such title, and must fall with it. 4th. The doctrine of subrogation only applies to lawful and meritorious transactions. It is a doctrine which prevails only in equity; and it would be absurd to say if the transactions were illegal and void, and cannot be upheld for that reason, that these mortgages, which if paid for at all by the company, were based upon such illegal transactions, and taken by them by way of security for the loan, can be enforced by them.
YI. The only question that remains to be considered is whether the other plaintiffs who are the holders of a portion of these certificates, are entitled to any relief in this suit.
The argument in support of the affirmative of this proposition is founded entirely upon the assumption that the transaction which the preceding views condemn as usurious, illegal and void, was lawful, and can be enforced in some way. It is unnecessary to discuss the question on that assumption. If it was a loan upon usurious interest, and the certificates were under seal, as the plaintiffs contend, and, as I think, the proof establishes, the holders, as assignees, took them cum mere, chargeable with notice of all the material facts connected with their original concoction and subsequent mutations. If they did not possess the ingredients of commercial paper, that fact was sufficient to put all persons, dealing in them, upon inquiry, and deprives them of any protection as innocent or bona fide holders. I think they stand in no better situation, in this respect, than the company would after having redeemed the ' certificates.
I am therefore of the opinion that the holders of the certificates are not entitled to any decree in their favor. If I am right in holding the transaction a loan, and that it is affected with usury, then no one is entitled to any benefit from any thing connected with or growing out of it. In other words, the court will not aid a party who has been connected with it, or *661 who stands chargeable with notice. Potior est conditio possidentis.
There were many points raised and discussed upon the argument which have not been adverted to in this opinion. The views expressed have superseded the necessity of doing so.
The result is that the bill must be dismissed with costs.